# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JABRIL AKI WILSON,

        Petitioner,

v.

DYLON RADTKE,

        Respondent.

Case No. 18-CV-1756-JPS

**ORDER**

    Petitioner Jabril Aki Wilson ("Wilson") brings this petition for a writ of habeas corpus challenging a state court conviction arising from Milwaukee County Circuit Case No. 2012CF003720. (Docket #1). In that case, a jury found Wilson guilty of enticing a child with intent to have sexual contact in violation of Wisconsin Statute section 948.07(1). Wilson raises four grounds of habeas relief, the first three of which essentially challenge the sufficiency of the evidence used to convict him, and the fourth of which contends that trial counsel was ineffective for failing to appropriately address the "intent" element of the crime. For the reasons explained below, the Court finds that Wilson's petition is without merit and, therefore, must be denied. Accordingly, Wilson's motion for release pending appeal will also be denied. (Docket #23).

1. **STANDARD OF REVIEW**

    State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act (the "AEDPA")) requires the petitioner to show that the state court's decision on the merits of his

constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141. Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2005); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could

disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *See id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1);

*Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question *de novo*. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

## 2.    RELEVANT BACKGROUND

In 2012, the State of Wisconsin charged seventeen-year-old Wilson with second-degree sexual assault of a child, kidnapping, enticement of a child with intent to have sexual contact, and being a party to the crime of second-degree sexual assault of a child. The charges arose after fifteen-year-old S.P. filed a police report alleging that Wilson took her to his friend's house and raped her. *See* (Docket #15-2 at 1–2). A jury acquitted Wilson of both charges of second-degree sexual assault, as well as of the kidnapping charge, but it found him guilty of the enticement charge, in violation of Wisconsin Statute section 948.07(1). As a result of this conviction, the state court sentenced Wilson to ten years' imprisonment.

At trial, the jury heard testimony from S.P., who explained that Wilson (who went by the moniker "Blue") drove up to her while she was waiting at a bus stop and offered her a ride back to her group home. However, Wilson detoured to pick up a friend, then drove to another house where Wilson said he was going to change clothes. S.P. testified that she went with them into the house and Wilson gave her the option of sitting in

the living room or coming with him to his bedroom. She decided to go upstairs with him. Once in his room, they talked for a bit. After a short while, Wilson asked her if she wanted to have sex with him. She said no. When he asked her why, she told him that she was ready to go home. Wilson told her she would have to walk home if she refused to have sex with him. She reiterated that she wanted to go home. He said that she could not leave unless she performed oral sex on him. She relented. When she asked again if she could go home, he insisted upon having intercourse. She continued to say that she did not want to, and he continued to say that he would not take her home. She relented again.

Afterwards, Wilson made comments along the lines that S.P. now belonged to him, and he called several more of his male friends—between ten and fifteen—to come over and look at S.P. The group huddled in the small room that S.P. believed to be Wilson's bedroom and used the flashlights on their phones to appraise her body. Wilson stood by and allowed this to happen. Several of the men raped S.P.

S.P. testified that Wilson and the other men kept her in the house—which she eventually understood to be abandoned—for three days. During this time, she was barely fed. On the third day, they kicked her out. S.P. began walking home, but Carlita Harris ("Harris"), who worked at S.P.'s group home (and who later testified, as well), happened to drive by and pick her up. Harris noticed S.P.'s torn clothing and missing hair extensions and asked her what had happened. Eventually, S.P. told her. Harris helped S.P. receive medical treatment and file a police report.

When S.P. first spoke to the police, they did not believe her and suggested to her that she was lying. She found the process of talking to them exhausting. At a certain point, she decided she did not want to keep being

questioned, so she agreed with them that she was lying. A few years later, however, new evidence surfaced, and the police reopened her case. The defense cross-examined her on the inconsistencies between her police reports and the testimony elicited during the direct examination. *See e.g.*, (Docket #15-13 at 106–37).

The jury also heard testimony from Wilson, who denied that he had any kind of sex with S.P. (Docket #15-16 at 65:13–17). Wilson confirmed that he gave his number to S.P. at a bus stop, but he said that S.P. had been the one to request a ride home. When Wilson stopped at the first house, S.P. told him she wanted to hang out and did not want to return to the group home. Wilson took S.P. and his friend Christian to the abandoned house (which his friend Christian's family had recently moved out of) because that was where everyone from his neighborhood went to hang out. Once they got to the house, S.P., Wilson, and Christian talked and smoked for thirty to forty-five minutes. S.P. told them about her frustrations with the group home. At a certain point, Wilson noticed that she and Christian had started talking closely. The trio migrated upstairs, where they continued talking about S.P.'s group home situation. Eventually, Wilson left Christian and S.P. alone and went home for dinner. As he was leaving, he offered to drive S.P. home, but she said she would prefer to continue hanging out with Christian.

Wilson returned to the house with some friends later that night, after 11:00 p.m., and he found that S.P. was still there. The group continued to smoke marijuana and talk. Wilson did not see S.P. partake in smoking, and he left the house by 2:00 a.m. When he left, S.P. indicated that she was going to spend the night, and Christian—whose family had owned the house— told her that was okay. At some point over the weekend, Christian told

Wilson that he and S.P. engaged in a sexual relationship, and that S.P. had been involved with other visitors to the house, as well. Wilson, who had initially brought S.P. to the house, was put off by this. However, Wilson never saw S.P. have any kind of sex with anyone, including himself.

The next day, Saturday, Wilson did not go to the abandoned house because he did not feel like smoking or hanging out. On Sunday afternoon, he went back to the abandoned house with a group of friends, and S.P. answered the door. Wilson asked her where Christian was, but S.P. said she did not know. Wilson asked her why she was still around, and she told Wilson that Christian had told her she could stay. Wilson thought S.P. was in a good mood and did not notice any changes to her demeanor between the first and third day.

The group entered the house to smoke and began talking about inviting a few girls over. At this point, S.P.'s presence presented a problem, so the group asked her to leave. S.P. refused, saying she would get in trouble if she went back to the group home, and that she had already run away so there was no point in going back. Wilson tried to reason with her to go, but she refused. One of Wilson's friends noted that if the group home was looking for her, they might get in trouble if the group home found out that S.P. was staying at their abandoned house. Eventually, the group talked S.P. out of the house and locked the door. S.P. got angry and began yelling.

Wilson also testified about his earlier interview with the police, in which he admitted to having oral sex with S.P. He testified to the nature of the interview, the circumstances surrounding the interrogation, and the reason why he said they engaged in oral sex. The jury heard that, during the interrogation, Wilson, a minor, was questioned without the presence of

a guardian and was inebriated, sleep deprived, and dizzy from having his stomach pumped. Wilson explained that he had gone along with what the detective told him Christian had said because Wilson thought that was what they wanted to hear, and he wanted to go home. The State of Wisconsin thoroughly cross examined him on this discrepancy and also elicited his acknowledgment that some people probably did bring their girlfriends to the house in order to have sex. (Docket #15–17 at 44:6–15).

After hearing this and other evidence, the jury received an instruction regarding the child enticement charge:

> Child enticement as defined in Section 948.07 of the Criminal Code of Wisconsin is committed by one who with intent to have sexual intercourse causes any child who has not attained the age of 18 years to go into any vehicle, building, room or secluded place. Before you may find the defendant guilty of this offense the State must prove by evidence which satisfies you beyond a reasonable doubt that the following three elements were present:
>
> One, the defendant caused [S.P.] to go into a building.
>
> Two, the defendant caused [S.P.] to go into a building with intent to have sexual intercourse with her. The phrase "with intent to" means that the defendant must have had the mental purpose to have sexual intercourse with [S.P.].
>
> And three, [S.P.] was under the age of 18 years. Knowledge of [S.P.]'s age by the defendant is not required and mistake regarding her age is not a defense. Again, you cannot look into a person's mind to find intent. Intent must be found, if found at all, from the defendant's acts, words[,] and statements, if any, and from all the facts and circumstances bearing upon intent.
>
> If you're satisfied beyond a reasonable doubt that all three elements of this offense have been proved[,] you should find the defendant guilty. If you're not so satisfied[,] you must find the defendant not guilty.

(Docket #15-18 at 46:6–47:8). During deliberations, the jury asked, "does a person thinking, hoping, or being interested in an action equal intent?" (Docket #15-20 at 3:11–13). After argument from counsel, the state court issued a supplementary instruction modeled off the original instruction, (*id.* at 10:18–22), explaining, effectively, that "with intent to" "means that the defendant must have had the mental purpose to [commit the action] or was aware that his conduct was practically certain to cause that result." Wis. Jury Inst. 923(b).

3.   ANALYSIS

   3.1   Sufficiency of Evidence

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). To successfully challenge the sufficiency of the evidence of a conviction, a habeas petitioner must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" based on the evidence presented at trial. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The court need not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318–19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

In *State v. Poellinger*, the Wisconsin Supreme Court adopted a similarly deferential standard for reviewing challenges to the sufficiency of evidence, which stems from *Jackson v. Virginia*. 451 N.W.2d 752, 757 (Wis. 1990). Specifically, in *Poellinger*, the Wisconsin Supreme Court stated that

"when faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* (citing *Jackson*, 443 U.S. at 326).

As far as the burden of proof is concerned, the State needed to provide evidence to prove "beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364. Accordingly, in order to prove a violation of Wis. Stat. § 948.07(1), the state needed evidence to establish that Wilson (1) took S.P. to the abandoned house; (2) with the intent to commit a sex act; (3) and S.P. was under the age of 18. Wilson does not take issue with the first or third elements; his primary argument is that the state did not prove his intent because the jury acquitted him of all other sex charges. He contends that the mere fact that he brought S.P. to the house does not, intrinsically, mean that he had the intent to engage in sex with her. Rather, he argues, he may well have wanted to hang out and smoke weed with her.

The Wisconsin Court of Appeals addressed Wilson's contention that there was insufficient evidence to sustain a verdict on the child enticement charge. It explained:

> Wilson testified that [he] was driving when he saw S.P. at a bus stop. He stopped to talk to her. Wilson testified that he asked for S.P.'s phone number, but S.P. did not have a phone so he gave her his number instead. Wilson testified that S.P. then asked for a ride back to the place where she was staying, which was a group home. Wilson testified that he stopped at his house on the way, where neighbors were outside talking. Wilson testified that S.P. then said she wanted to hang out and did not want to go to the group home. Wilson testified that he took S.P. to the home of his friend Christian, where he and his friends had been going to drink and smoke because

> Christian's family had recently moved out. Wilson testified that he did not intend to have sexual contact with S.P. when he took her to the house but acknowledged on cross-exam that his friends sometimes brought girls there to have sex with them. Wilson testified that he was seventeen years old when these events occurred and S.P. told him she was eighteen years old. There was no dispute that S.P. was, in fact, fifteen. Because a reasonable jury could have concluded that Wilson brought S.P. to Christian's house with the intent to have sexual contact with S.P., there would be no arguable merit to a challenge to the sufficiency of the evidence.

(Docket #2-1 at 5–6).

The Wisconsin Court of Appeals manages to characterize the facts favorably to Wilson, while being appropriately deferential to the jury's conclusion. In other words, based solely on the facts presented in Wilson's testimony, the Court of Appeals determined that a factfinder could draw a reasonable inference that Wilson took S.P. to the house with intent to have sexual contact. *Poellinger*, 451 N.W.2d at 757 ("[W]hen faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law."). This was the correct standard to apply when reviewing a sufficiency of evidence challenge, and the Court will not disturb the conclusion. The fact that the jury concluded that Wilson did not *actually* have sexual contact with S.P. does not foreclose their conclusion that he initially intended for it, and there was some evidence in Wilson's testimony by which they reasonably could have concluded that he did intend for it (i.e., he gave her his number, he gave her a ride, and he took her to a place where people sometimes had sex). Therefore, Wilson's challenge to the sufficiency of the evidence fails.

### 3.2 Challenges to Jury Instructions

Wilson also contends that his trial counsel was ineffective for failing to challenge the "intent" element of the jury instructions which, he claims, were confusing to the jury, as evidenced by their question regarding intent. This Court cannot consider this claim unless it has first been "fully and fairly presented . . . to the state appellate courts," thereby giving the courts a "meaningful opportunity to consider the substance of the claim[] that he later presents in his federal challenge." *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005); 28 U.S.C. § 2254(b)(1)(A). Fair presentment requires that the petitioner apprise the state courts of the constitutional nature of the claim, although it "does not require hypertechnical congruence between the claims made in the federal and state courts." *Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006) (citation omitted).

Petitioner did not raise the intent issue in his briefing before the Wisconsin state court, and the Wisconsin state court has not had the opportunity to consider the issue. Accordingly, this Court cannot engage in an analysis of whether Wilson's counsel was ineffective. This finding does not skirt a meritorious issue: Wilson's counsel argued vigorously regarding what instruction the jury should receive in response to its question on intent. It does not appear that counsel was at all unreasonable in his representation. *United States v. Strickland*, 466 U.S. 668, 690 (1984).

### 4. CONCLUSION

For the reasons explained above, the Court finds that Wilson's asserted grounds for relief are without merit. The Wisconsin state courts did not err in their conclusions of law and fact regarding whether Wilson's due process rights were violated by the sufficiency of the evidence on the child enticement charge. Additionally, Wilson's challenge to his attorney's

failure to appropriately argue the intent element is both not exhausted—and therefore not properly before this Court—and unpersuasive.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), Wilson must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). As the Court discussed above, no reasonable jurists could debate whether the petition has merit. The Court must, therefore, deny Wilson a certificate of appealability.

Accordingly,

**IT IS ORDERED** that Petitioner's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Petitioner's motion for release pending appeal (Docket #23) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to Petitioner's petition be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of March, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

This order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.